**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NEDENIA UDOVICH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ESSILORLUXOTTICA S.A.; LUXOTTICA GROUP S.P.A.; ESSILOR INTERNATIONAL SAS; ESSILORLUXOTTICA USA INC.; LUXOTTICA U.S. HOLDINGS CORP.; ESSILOR OF AMERICA HOLDING COMPANY, INC.; LUXOTTICA OF AMERICA, INC.; ESSILOR OF AMERICA INC.; EYEMED VISION CARE, LLC; AND VISION SOURCE, LLC, <br><br> Defendants. | Case No. 1:23-cv-15854 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Nedenia Udovich ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to herself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on Defendants' EssilorLuxottica S.A., Luxottica Group S.p.A., Essilor International SAS, EssilorLuxottica USA Inc., Luxottica U.S. Holdings Corp., Essilor of America Holding Company, Inc, Luxottica of America, Inc., Essilor Of America Inc., EyeMed Vision Care, LLC, and Vision Source, LLC (together, "Defendants" or "EssilorLuxottica") violations of federal antitrust laws.

## NATURE OF THE ACTION

1. Following decades of aggressive mergers and acquisitions, EssilorLuxottica has emerged as the world's largest eyewear company. Today, it is a vertically integrated, multi-national behemoth which designs, manufactures, distributes, and sells eyewear, including eyeglasses and sunglasses, wholesale and at retail to consumers.

2. EssilorLuxottica produces and distributes eyewear for many of the world's most well-known fashion houses under exclusive licenses. EssilorLuxottica also promotes and sells its own famous brands, including Ray-Ban, Oakley, and Persol, as well as its competitors' brands—which EssilorLuxottica sells through its wholly-owned retail channels.

3. This action concerns the exclusionary acts and practices of EssilorLuxottica in the eyewear industry. EssilorLuxottica has improperly maintained monopoly power in the eyewear industry by engaging in exclusionary acts and practices, including entering long-term, exclusive licensing contracts with various fashion houses, imposing restrictive sales agreements on competing eyewear manufacturers, and improperly steering customers towards its

own products via its wholly-owned vision insurance company, EyeMed. Luxottica's conduct has led to higher prices, lower output, reduced innovation, and diminished consumer choice.

4. Plaintiff brings this antitrust class action lawsuit on behalf of herself and a nationwide Class of all similarly situated persons and entities who purchased eyewear directly from one or more EssilorLuxottica-operated physical or online outlets between 2007 and the present. Because of Defendants' violations of Sections 1 and 2 of the Sherman Act, Plaintiff and members of the Class were injured by paying significant overcharges on eyewear throughout the United States.

5. If Defendants are permitted to continue their anticompetitive scheme, Plaintiff and members of the Class will continue to pay supracompetitive prices on eyewear. Plaintiff brings this action to seek damages and permanently enjoin Defendants' misconduct.

**JURISDICTION, VENUE, AND EFFECT ON INTERSTATE COMMERCE**

6. Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to (i) recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; (ii) enjoin Defendants' anticompetitive conduct; and (iii) for such other relief as is afforded under the laws of the United States for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

8. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, one or more Defendants resided, transacted business, was found, is licensed to do business, and/or had agents in this District.

2

9.     This Court has personal jurisdiction over each Defendant pursuant to Section 12 of the Clayton Act (15 U.S.C. §§ 22), because, among other things, each Defendant: transacted business throughout the United States, including in this District and/or engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District. Each Defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each Defendant committed intentional acts that were intended to cause and did cause injury within the United States.

10.     Throughout the Class Period, Defendants manufactured, produced, sold and/or shipped substantial quantities of eyewear in a continuous and uninterrupted flow of transactions in interstate commerce throughout the U.S., including within this District. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

11.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

12.     Plaintiff Nedenia Udovich is a New Jersey resident who purchased, for her own personal or household consumption, eyewear, including Licensed Eyewear (defined below), directly from a Retail Outlet (defined below) during the Class Period (defined below).

13.     Defendant EssilorLuxottica S.A. is corporation organized under the laws of France, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France.

3

EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS.

14.     Defendant Luxottica Group S.p.A. is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20123 Milan, Italy. Luxottica Group S.p.A. owns Defendant Luxottica U.S. Holdings Corp. and online retailer Glasses.com. Luxottica Group S.p.A. also owns Alain Mikli, Arnette, Costa Del Mar, Inc., Oakley, Inc., Oliver Peoples, Persol, Ray-Ban, Sferoflex, Starck Biotech Paris, and Vogue Eyewear and holds exclusive licenses for the eyewear brands of the Fashion Houses (defined below). To the extent that several of the Fashion Houses have renewed their licensing agreements since the merger of Luxottica Group S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly.

15.     Defendant Essilor International SAS is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Essilor International SAS owns Defendant Essilor of America Holding Company, Inc., Costa Del Mar, Inc., and Defendant Vision Source, LLC.

16.     Defendant EssilorLuxottica USA Inc. is a Delaware corporation with its principal place of business at 12 Harbor Park Drive, Port Washington, New York 11050. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business activities.

17.     Defendant Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business at 44 Harbor Park Drive, Port Washington, New York 11050. Luxottica U.S. Holdings Corp. owns Defendant Luxottica of America, Inc.

18. Defendant Essilor of America Holding Company, Inc. is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. Essilor of America Holding Company, Inc. owns Defendant Essilor of America Inc.

19. Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc., owns retailers LensCrafters, Pearle Vision, Target Optical, and Sunglass Hut. Luxottica of America, Inc., also owns Defendant EyeMed Vision Care, LLC.

20. Defendant Essilor of America Inc. is a Delaware corporation with its principal place of business at 13555 N. Stemmons Fwy, Dallas, Texas 75234. Essilor of America Inc. owns Defendants Vision Source and Frames for America, Inc.

21. Defendant EyeMed Vision Care, LLC, is a company formed under the laws of Delaware with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040 United States. Defendant Luxottica of America, Inc., owns Defendant EyeMed Vision Care, LLC.

22. Defendant Vision Source, LLC, is a company formed under the laws of Texas with its principal place of business at 23824 Highway 59 N, Kingwood, Texas 77339. Defendant Essilor International SAS owns Defendant Vision Source, LLC.

23. Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants, including several luxury fashion houses and other competing eyewear manufacturers. The co-conspirator fashion houses include: Giorgio Armani S.p.A., Brooks Brothers (Retail Brand Alliance, Inc.), Anne Klein (Jones Apparel Group), Bulgari S.p.A., Chanel S.A., Gianni Versace S.p.A., Prada SA and Gruppo Prada, Paul Smith, Tiffany & Co., Donna Karan International Inc., Burberry Group pic, Polo Ralph Lauren

Corp., Stella McCartney Limited, Salvatore Ferragamo Italia S.p.A., Tory Burch LLC, Coach, Inc., Michael Kors Holdings Limited, Dolce & Gabbana S.r.I., Valentino S.p.A., and others (collectively, the "Fashion Houses" ). The co-conspirator competing eyewear manufacturers include: Kering Eyewear S.p.A., Marcolin S.p.A., Safilo S.p.A., Costa Del Mar, Inc., Maui Jim, Inc, and Thélios S.p.A along with its parent company LVMH Moët Hennessy Louis Vuitton (collectively the "Competing Manufacturers"). The Fashion Houses and Competing Manufacturers have performed acts and made statements in furtherance of the conspiracy. The Fashion Houses and Competing Manufacturers are jointly and severally liable for the acts of the Defendants. Their agreements with the named Defendants are anticompetitive restraints of trade that resulted in or supported EssilorLuxottica's market power and collection of monopoly rents for the sale of its eyewear to end consumers (i.e., the Class members).

24.     Each Defendant named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

25.     Defendants are also liable for acts done in furtherance of the alleged anticompetitive conduct by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

26.     EssilorLuxottica is a vertically integrated, multinational, corporate conglomerate that designs, manufactures, distributes, and sells eyeglasses, sunglasses, corrective lenses, and vision benefits to consumers. As explained below, EssilorLuxottica uses its massive footprint to engage in the anticompetitive conduct described in this complaint.

### A. Market for Eyewear in the United States

27.     The market for eyewear includes various type of products designed to enhance vision, protect the eyes, or serve as fashion accessories. This market includes prescription

6

eyeglasses, non-prescription glasses (also known as plano glasses), and sunglasses (the "Eyewear Market").

28.     Within the broader Eyewear Market, there is also a high-end, luxury market for designer-branded eyeglasses and sunglasses (the "Premium Eyewear Market"). Glasses and sunglasses in the Premium Eyewear Market are typically made of higher quality materials and come in a wide variety of styles.

29.     According to a 2021 report, 166.5 million adults in the United States wear prescription eyeglasses, or approximately 63% of the adult U.S. population, and 223.5 million adults, approximately 85%, wear sunglasses.

30.     In 2023, the revenue of the Eyewear Market in the United States is expected to reach approximately $30 billion. The United States is the leading country in generating revenue in the Eyewear Market.

31.     In 2019, the average price of prescription glasses in the United States was in the hundreds of dollars, with frames averaging $238 and lenses averaging $113. According to two former executives of LensCrafters, Charles Dahan and E. Dean Butler, who founded LensCrafters in 1983, prescription glasses prices are marked up nearly 1,000 percent. Butler has said that consumers could "get amazingly good frames . . . for $4 to $8 . . . . For $15, you can get designer-quality frames, like what you'd get from Prada."[1] Dahan and Butler confirmed that the main culprit for the high prices for eyewear is EssilorLuxottica, which as explained below, controls the entire eyewear industry.

---

[1] Chavie Lieber, "Glasses can have a markup of 1,000%. Two former LensCrafters executives revealed why," Vox (March 6, 2019), *available at* https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica.

### B. EssilorLuxottica's Rise to Dominance

32.     What started as "Luxottica" in Italy in 1961 was originally a manufacturing company for optical components and accessories. In its current iteration, EssilorLuxottica is now the biggest eyewear company in the world. It operates in each stage of the eyewear production and distribution process. EssilorLuxottica became the giant it is today through a long series of calculated acquisitions.

33.     Setting the stage for its vertical integration strategy, Luxottica made its first acquisition in 1974 when it acquired Italian eyewear distributor Scarrone S.p.A. Luxottica's international expansion began in the 1980s when it acquired a number of independent distributors, opened branches, and formed joint-ventures in foreign markets. In 1981, Luxottica acquired Avant Garde Optics Inc., a wholesale distributor on the United States market.

34.     Throughout the next several decades, Luxottica continued to aggressively grow through acquisitions. Luxottica bragged that "[i]n the 90s it launched a campaign of acquisitions targeting prestige brands, the start of an incredible series of commercial successes, especially in the USA."[2] Specifically, in 1990, Luxottica acquired Vogue Eyewear, and in 1995, it acquired Persol.

35.     In the spring of 1995, Luxottica purchased the United States Shoe Corporation, the parent of LensCrafters, North America's biggest retail optical chain, then owning 870 stores. Today, LensCrafters has 933 stores throughout the United States.

36.     Next, in June of 1999, Luxottica "definitively claimed global leadership status" by acquiring Ray-Ban, the world's best-known sunglass brand.

---

[2]https://web.archive.org/web/20130417054359/http://www.luxottica.com/en/activities/production/trends_growth/trends_growth_2.html.

37. In 2001, Luxottica continued its buying spree, purchasing the Sunglass Hut chain, the world's biggest distributor of premium sunglasses. As of April 2023, Sunglass Hut operated a retail network of 1,530 stores throughout the United States.

38. Three years later, in 2004, Luxottica acquired Cole National, which owned Pearle Vision, as well as the optical departments of Sears, Target, and JCPenney. Luxottica's 2004 purchase of Pearle Vision raised concerns with federal antitrust enforcers. Eyewear manufacturers worried it would allow Luxottica "to raise prices, cut quality and reduce services."[3] Antitrust lawyer Steve Newborn, a former Federal Trade Commission mergers enforcement chief, commented at the time that "[t]here is some indication that Luxottica's earlier acquisitions have led to just that."[4]

39. Next, in June 2007 Luxottica bought Oakley for approximately $2.1 billion. Through the deal, Luxottica gained a retail network of over 400 stores as well as control of three more retailers, including Bright Eyes and Sunglass Icon—Sunglass Hut's main competitor. Oakley also brought with it the brand Oliver Peoples and a licensing agreement with Paul Smith.

40. During the last decade, Luxottica continued to grow by aggressively acquiring other eyewear companies, including the following companies:

     i. 2011: Multiópticas Internacional (GMO)

     ii. 2012: Grupo Tecnol

     iii. 2013: Alain Mikli International

     iv. 2014: Glasses.com

---

[3] Jayne O' Donnell, *Antitrust worries rise over LensCrafters-Pearle merger*, USA Today (May 12, 004), *available at* https://web.archive.org/web/20150327045405/http://usatoday30.usatoday.com/money/companies/regulation/2004-05-12-eyeglasses_x.htm.

[4] *Id.*

9

     v.    2016: Salmoiraghi & Viganò

    vi.    2017: Óticas Carol

   vii.    2018: Fukui Megane Co. Ltd.

41.     In addition to acquisitions, Luxottica signed exclusive licensing contracts with many high-end fashion designers, including the Fashion Houses, which significantly aided its growth strategy. For instance, in 1988, Luxottica signed a license agreement with Giorgio Armani to design and create glasses under the designer's name. This partnership marked the first of many luxury fashion brands to join forces with Luxottica through exclusive licensing agreements.

42.     On October 1, 2018, Luxottica merged with Essilor, a leading manufacturer of optical lenses. Like Luxottica, Essilor is a decades-old company that grew aggressively through acquisitions, namely:

     i.    1995: Gentex Optics

    ii.    2008: Satisloh

   iii.    2009: FramesDirect.com

   iv.    2010: Shamir Optical; Signet Armorlite; FGX

     v.    2013: Costa; Bolon

    vi.    2014: Transitions Optical

   vii.    2015: Vision Source; PERC/IVA

  viii.    2016: VisionDirect; MyOptique; Photosynthesis Group

   ix.    2019: Brille24

43.     With the $49 billion merger of Luxottica and Essilor, EssilorLuxottica was formed and has been the dominant eyewear company ever since.

44.     While the merger was ultimately cleared by government antitrust authorities, the deal was highly criticized as leading to greater industry consolidation and being anticompetitive. For instance, United States Senators called out the merger as being anticompetitive as part of their "A Better Deal" platform:

> Eyeglasses are a necessity for many Americans, but due to consolidation and concentration in the supply chain, they are increasingly difficult to afford. In fact, the current average price of eyeglasses is now at $400, a cost in line with an iPad, and is steadily rising . . . . The current eyeglass industry, both in the U.S. and abroad, is largely dominated by one company – Luxottica – which owns and manufactures most of the top eyewear and sunglass brands, such as Oakley, Ray-Ban, and Persol, in addition to luxury designer brands. It also owns most of major distribution chains like LensCrafters, Pearle Vision, Sears and Target Optical, and vision insurance company EyeMed Vision Care. If Essilor, which controls 45 percent of the global market share for lenses, successfully acquires Luxottica, the nearly $50 billion merger is set to control the entire supply chain of eyeglasses.[5]

45.     Even after merging, the newly formed mega-company did not stop its pattern of aggressive acquisitions. In 2021, EssilorLuxottica closed on its $8 billion acquisition of Dutch eyewear retailer GrandVision NV. EssilorLuxottica's purchase of GrandVision NV gave it control of an additional 7,200 stores worldwide, including over 100 ForEyes retail stores in the United States—ForEyes had been purchased by GrandVision in 2015—plus the online site foreyes.com.

### C. EssilorLuxottica's Business and Distribution Model

46.     EssilorLuxottica has developed a geographic footprint that spans 150 countries, all of which are covered by its wholesale distribution network. This is complemented by an extensive retail network composed of LensCrafters, Oakley, Sunglass Hut, and Cole National,

---

[5]https://web.archive.org/web/20180717211807/https://www.democrats.senate.gov/imo/media/doc/2017/07/A-Better-Deal-on-Competition-and-Costs-1.pdf.

which includes the Pearle Vision, Sears Optical, and Target Optical store chains. In 2022, EssilorLuxottica operated nearly 4,000 Retail Outlets, as defined below, in North America.



**Figure 1: Total number of stores of EssilorLuxottica in North America in 2022, by brand.**[6]

47.    Two additional sites on which EssilorLuxottica sells eyewear over the internet are Glasses.com and FramesDirect.com.

48.    LensCrafters, Oakley, Sunglass Hut, Pearle Vision, Sears Optical, Target Optical, Glasses.com, FramesDirect.com, For Eyes, and other brick-and-mortar or online sites in EssilorLuxottica's retail network are collectively referred to as the "Retail Outlets."

49.    EssilorLuxottica also sells through ophthalmic distributors and third-party retail channels ("Third-Party Sellers").

---

[6] Source: Statista. *Available at* https://www.statista.com/statistics/241663/number-of-stores-of-luxottica-in-north-america/.

50.    In 2015, Essilor acquired Vision Source, LLC ("Vision Source"), the largest alliance of independent optometrists in North America. Following the merger of Essilor and Luxottica, Vision Source became part of EssilorLuxottica's corporate family. In 2022, Vision Source included nearly 3,000 optometry practices in the United States. In accordance with franchise law, Vision Source is a franchisor, and its members are franchisees who own their respective practice(s). Collectively, this network is the largest optical retailer in the United States.

51.    EssilorLuxottica manufactures, markets, and sells eyewear from its own brands, including Vogue Eyewear, Persol, Ray-Ban, Oakley, Alain Mikli, and others (collectively referred to as "Proprietary Eyewear").

52.    In addition to its Proprietary Eyewear, EssilorLuxottica has many licensed eyewear brands in its portfolio. EssilorLuxottica markets and sells licensed eyewear from major fashion houses, including Giorgio Armani, Brunello Cucinelli, Bulgari, Burberry, Chanel, Coach, Dolce&Gabbana, Ferrari, Michael Kors, Prada, Ralph Lauren, Starck Biotech Paris, Swarovski, Tiffany & Co., Tory Burch, Versace, and others (collectively referred to as "Licensed Eyewear").

**Figure 2: EssilorLuxottica's Proprietary and Licensed Eyewear brands.**

53.     EssilorLuxottica sells both Proprietary Eyewear and Licensed Eyewear in its Retail Outlets and through Third-Party Sellers. In its Retail Outlets, EssilorLuxottica does not identify for consumers that it is the exclusive licensee, manufacturer, and distributor of the eyewear it sells, including the Licensed Eyewear. Besides Proprietary Eyewear and Licensed Eyewear, EssilorLuxottica sells eyewear manufactured by competing eyewear manufacturers in its Retail Outlets. Nevertheless, nearly 90% of products sold in EssilorLuxottica's Retail Outlets are manufactured by EssilorLuxottica.

54.     EssilorLuxottica manufactures, markets, and sells lenses that are used in eyeglasses and sunglasses, as well. EssilorLuxottica's own brands of lenses include Essilor,

14

Barberini, Oakly, Ray-Ban, Shamir, Transitions, among others (together, "Proprietary Lenses"). EssilorLuxottica also has licenses with famous brands, such as Nikon and Kodak, to market and sell lenses under their brand names (together, "Licensed Lenses").



**Figure 3: EssilorLuxottica's Proprietary and Licensed Lenses Brands.**

55.     Between eyewear and lenses, EssilorLuxottica owns an extensive list of trade names, patents, and technology processes. EssilorLuxottica owns over 12,000 patents and produces more than 3,500 new eyewear models every year.

56.     EssilorLuxottica also owns and operates its own vision insurance company, EyeMed Vision Care, LLC ("EyeMed"), which is one of the largest vision insurance companies in the United States. EyeMed has more than 60 million members and a network of approximately 20,000 providers. Luxottica acquired EyeMed in 1998, and today it is part of EssilorLuxottica's corporate family.

57.     In sum, the tangled web of EssilorLuxottica's vertically-integrated business includes:

- Retail stores

- Online stores

- Third-party sellers

- Optometry practices

- Proprietary and Licensed Eyewear (manufactured by Essilor/Luxottica)

-  Proprietary and Licensed Lenses (manufactured by Essilor/Luxottica)

- Vision insurance

### D. EssilorLuxottica's Exclusionary and Anticompetitive Conduct

58.     EssilorLuxottica has engaged in a variety of anticompetitive conduct to monopolize and restrain trade in the Eyewear and Premium Eyewear Markets.

#### i.     Exclusive Licensing Agreements with the Fashion Houses

59.     As previously mentioned, EssilorLuxottica has entered into a series of licensing agreements with nearly 30 brands, including with the Fashion Houses (the "Licensing Agreements"). The Licensing Agreements grant EssilorLuxottica licenses to design, manufacture and distribute eyewear, under the brands and marques of the Fashion Houses. As acknowledged by EssilorLuxottica, the Licensing Agreements are "exclusive, global contracts that have terms . . . [up to] *15 years* and may contain options for renewal."

60.     Under these Licensing Agreements, EssilorLuxottica pays a royalty ranging from 6% to 13% and a mandatory marketing contribution of between approximately 4% and 12% of net sales of the related collection.

61.     EssilorLuxottica has exclusive licensing agreements with the following brands:

> i.     **The Armani Group**: under license agreement since 1988. The exclusive license was most recently renewed in 2022 for 15 years, effective January 1, 2023 through December 31, 2037. The Armani Group includes Giorgio Armani, Emporio Armani, and Armani Exchange.

16

ii. **Brunello Cucinelli:** license agreement signed in 2022. The exclusive license is effective for 10 years, effective January 1, 2023 through December 31, 2032.

iii. **Bulgari:** under license agreement since 1997. The exclusive license was most recently renewed in 2019 for three years, effective until December 31, 2023.

iv. **Burberry:** under license agreement since 1997. The exclusive license was most recently renewed in 2015 for 10 years, effective until December 31, 2025.

v. **Chanel:** under license agreement since 1999. The exclusive license was most recently renewed in 2019 for five years, effective January 1, 2020 through December 31, 2024, with the option of a three-year extension from January 1, 2025 to December 31, 2027.

vi. **Coach:** under license agreement since 2012. The exclusive license was most recently renewed in 2021 for five years, effective July 1, 2021 through June 30, 2026.

vii. **Dolce & Gabbana:** under license agreement since 2006. The exclusive license was most recently renewed in 2020 for 10 years, effective until December 31, 2029.

viii. **Jimmy Choo:** license agreement signed in 2023. The exclusive license is effective for 10 years, effective January 1, 2024 through December 31, 2033.

ix.   **Michael Kors:** license agreement signed in 2014. The exclusive license is effective for 10 years, effective January 1, 2015 through December 31, 2024.

x.   **Prada Group:** under license agreement since 2003. The exclusive license was most recently renewed in 2015 for 10 years, effective until December 31, 2025. The Prada Group includes Prada Eyewear, Prada Linea Rossa, and Miu Miu Eyewear collections.

xi.   **Ralph Lauren:** under license agreement since 2007. The exclusive license was most recently renewed in 2017 for 10 years, effective until March 31, 2027. Ralph Lauren includes Ralph Lauren, Polo Ralph Lauren, Ralph Eyewear, and Chaps.

xii.   **Swarovski:** license agreement signed in 2022. The license is effective for 10 years, effective January 1, 2023 through December 31, 2032.

xiii.   **Tiffany and Co:** under license agreement since 2008. The exclusive license was most recently renewed in 2017 for 10 years, effective until December 31, 2027.

xiv.   **Tory Burch:** under license agreement since 2009. The exclusive license was most recently renewed in 2021 for 10 years, effective until December 31, 2030.

xv.   **Versace:** under license agreement since 2003. The exclusive license was most recently renewed in 2020 for 10 years, effective until December 31, 2029.

62.     The multi-year, exclusive Licensing Agreements give EssilorLuxottica the authority to set prices for the licensed eyewear, or otherwise provide the means for EssilorLuxottica to control, maintain, and inflate the prices for all the licensed eyewear in the United States. The details of these multi-year, exclusive Licensing Agreements are well known to all of the Fashion Houses.

63.     The Fashion Houses produce and sell eyewear within the Eyewear and Premium Eyewear Markets, making them horizontal competitors of one another, as well as horizontal competitors of EssilorLuxottica. At all material times, the Fashion Houses operated or had access to independent production facilities for the manufacture of eyewear. Each of the Fashion Houses either produced or had the ability to produce their own eyewear at all material times. Accordingly, the Licensing Agreements are horizontal agreements among competitors to restrain trade.

64.     EssilorLuxottica's multi-year, exclusive Licensing Agreements with the Fashion Houses have restrained trade in the Eyewear and Premium Eyewear Markets. The duration of the Licensing Agreements has limited the ability of competitors or new entrants to compete because they are unable to negotiate more favorable contracts with the Fashion Houses to distribute their branded eyewear.

### ii.     EssilorLuxottica's Restrictive Sale Agreements

65.     In addition to selling Proprietary Eyewear and Licensed Eyewear in its Retail Outlets, EssilorLuxottica also sells products from competing eyewear manufacturers. These other manufacturers include among others, Kering Eyewear S.p.A., Marcolin S.p.A., Safilo S.p.A., Costa Del Mar, Inc., Maui Jim, Inc, and Thélios S.p.A along with parent company LVMH Moët Hennessy Louis Vuitton (collectively the "Competing Manufacturers").

66.     The Competing Manufacturers design and manufacture eyewear under their own names as well as under various fashion and luxury brands, including Gucci, Fendi, Guess and Tom Ford.

67.     The sales agreements between EssilorLuxottica and the Competing Manufacturers (the "Sales Agreements") have certain basic terms. The Sales Agreements are multi-year licenses for the distribution and sale of eyewear under which EssilorLuxottica pays the Competing Manufacturers or the relevant brands royalties or a portion of the sales on eyewear sold through EssilorLuxottica's Retail Outlets.

68.     Under the Sales Agreements, pricing decisions for sales through its Retail Outlets are delegated to EssilorLuxottica. Additionally, the Sales Agreements include most-favored nation and other price-coordination clauses ("MFNs"), which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EssilorLuxottica and the Competing Manufacturers. The details of the Sales Agreements are well known to all of the Competing Manufacturers.

69.     The Sales Agreements are horizontal agreements among competitors to restrain trade.

70.     EssilorLuxottica entered into the Sales Agreements with its competitors with the intention of benefitting from the coordination of distribution and pricing, access to information and especially pricing information, and the ability to charge supracompetitive prices for its eyewear and to exercise control over the production and supply of eyewear.

### iii. EssilorLuxottica's Anticompetitive and Exclusionary Practices at the Retailer Level

71.     EssilorLuxottica's anticompetitive and exclusionary practices exist at the retailer level, where EssilorLuxottica's uses its dominance to force independent optical retailers to stock its Proprietary Eyewear and Licensed Eyewear.

72.     The following account is from *The New Monopoly Capitalism and the Economics of Destruction*:

> Twice now, [the owner of an independent optical shop in Utah, John Cottam] whispers, he cut off purchasing from Luxottica because of the way they treat small businesses like his, but also twice now, he was forced back into Luxottica's corral, because the people who control that corporation used it to buy up yet another business or a few of the brand names that people expect to find in an independent store.
>
> Luxottica's capture of Oakley, Cottam says, amounted to a sort of checkmate, for it left him with no practical way not to do business with the Italian firm. Cottam has been on his own for a long time, and he does not like to admit that he might need help. But he's never seen anything like Luxottica before, and he no longer knows how to escape its reach.[7]

73.     In 2012, CBS News reported that "other competitors told us Luxottica has them in a chokehold: if you make glasses, you want to be in their stores; and if you have stores, you want to sell Ray-Bans! So Luxottica can set prices as high as it wants."[8]

74.     As explained by an independent eyewear retailer, if an independent retailer wants to stock a EssilorLuxottica product, the retailer has to comply with purchaser orders of pieces well above the norm, so, for example, if the retailers want to stock Chanel, the minimum

---

[7] Barry C. Lynn, Cornered: The New Monopoly Capitalism and the Economics of Destruction, John Wiley & Sons 2009.

[8] https://web.archive.org/web/20130311035909/http://www.cbsnews.com/8301-18560_162-57527151/sticker-shock-why-are-glasses-so-expensive/?pageNum=4.

purchase order is so high it can impose an enormous burden on small, independently owned retailers.

### iv.    Steering via EyeMed

75.     EssilorLuxottica uses its owned and operated vision insurance company, EyeMed, to exclude independent retailers from the market or force them to stock EssilorLuxottica's Proprietary Eyewear and Licensed Eyewear. EssilorLuxottica aggressively prices its plans "in order to move consumers to its own retail stores (LensCrafters and Pearle Vision, for example), putting pressure on reimbursement rates for exams – with Luxottica's underlying desire to increase sell-through of company-owned products as the leading licensor of brands for sunglasses and vision wear."[9]

76.     One independent retailer explained that EyeMed is "not so much insurance as a marketing ploy to get people to buy from their stores at a discount and to force the remaining independent stores to buy Luxottica controlled frames. . . . [M]ost people are unaware of this"[10]

77.     E. Dean Butler, a former executive who founded LensCrafters as well as EyeMed, described EssilorLuxottica's relationship with EyeMed as "an incredible conflict of interest . . .. The vision plans are manipulating the market for their own benefit . . . . Optometrists have lost control of their own profession."[11]

---

[9] Elizabeth Spaulding, *Do you see what we see? The future of independent optometry*, Bain Brief (Mar. 19, 2012), *available at* http://www.bain.com/publications/articles/the-future-of-independent-optometry.aspx.

[10] Anneli Rufus, *Wow -- the Eyewear Industry Is an Incredible Ripoff, But There Are Alternatives*, AlterNet (Aug. 30, 2010), *available at* https://www.alternet.org/2010/08/wow_--_the_eyewear_industry_is_an_incredible_ripoff_but_there_are_alternatives.

[11] David Lazarus, V*ision insurers have rigged the market to get you to buy their glasses*, LA Times (March 19, 2019), *available at* https://www.latimes.com/business/lazarus/la-fi-lazarus-eyewear-vision-plans-20190319-story.html.

78.     Through EyeMed, EssilorLuxottica wields its market power to steer patients towards its own Retail Outlets, such as LensCrafters, where most if not all frames and lenses are made by EssilorLuxottica—namely EssilorLuxottica's Proprietary and Licensed Eyewear and Proprietary and Licensed Lenses—or to Third-Party Sellers that feature EssilorLuxottica frames.

**E.  French Competition Authority Proceedings Against EssilorLuxottica**

79.     The Autorité de la Concurrence, which is France's competition authority ("FCA"), has levied significant fines against EssilorLuxottica for anticompetitive practices.

80.     On July 22, 2021, FCA fined EssilorLuxottica, specifically Luxottica France and Luxottica Group S.p.A., €125.2 million for two anticompetitive practices related to the sales of eyeglasses and sunglasses. The practices were described by FCA in detail in Decision No. 21-D-20.

81.     First, FCA found that Luxottica had distributed so-called "recommended" prices to its distributors and had encouraged them to maintain a certain level of retail sales prices for its products. Luxottica entered contracts with its distributors which were interpreted as prohibiting certain pricing practices during retail sales, in particular discounts and promotions. In addition, Luxottica imposed certain restrictions on its distributors regarding price advertising. Luxottica also organized retail price monitoring, enlisting the help of its distributors. Luxottica punished distributors who ignored its restrictions by delaying deliveries to their stores or by withdrawing the approval necessary for the distribution of certain of its brands.

82.     Second, FCA found that, in its distribution contracts with retailers, Luxottica explicitly forbid online sales of glasses from the fashion brands Prada, Dolce & Gabbana, and Bulgari.

83. A year later, on November 8, 2022, FCA fined EssilorLuxottica €81 million for hindering the development of e-commerce in the market for corrective lenses through anticompetitive trade practices. The practices were described by FCA in Decision No. 22-D-16.

84. The investigation and findings of FCA demonstrate that that EssilorLuxottica has engaged in anticompetitive practices designed to maintain market power and supracompetitive prices for eyewear.

## RELEVANT ANTITRUST MARKET AND ANTICOMPETITIVE EFFECTS

85. To the extent a relevant product market needs to be defined in this action, it is the Eyewear Market. The Premium Eyewear Market is a submarket within the Eyewear Market.

86. The Eyewear Market and Premium Eyewear Market do not include contact lenses. Contact lenses are not part of the Eyewear and Premium Eyewear Markets because they are not a reasonably interchangeable substitute for eyeglasses or sunglasses. Consumers would not switch from eyeglasses or sunglasses to contact lenses because of a small but significant non-transitory increase in price. For instance, contact lenses do not reduce brightness or shield eyes from ultraviolet radiation. Some consumers may not be able to wear contact lenses due to comfort or health reasons. Some consumers prefer to wear eyeglasses or sunglasses as a fashion statement. And consumers who choose to primarily wear contact lenses for vision correction often also need to wear eyeglasses or prescription sunglasses sometimes, as contact lenses are generally recommended to be worn for only a limited number of hours each day. *See In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1303 (M.D. Fla. 2016) (upholding allegations that disposable contact lenses were a relevant product market separate from eyeglasses or corrective vision surgery).

87. The relevant geographic market is the United States. EssilorLuxottica distributes and sells its eyewear products throughout the United States.

24

88.     EssilorLuxottica's anticompetitive conduct had the following effects, among others, in the Eyewear and Premium Eyewear Markets:

i.      Competition has been restrained or eliminated with respect to the sale and distribution of eyewear in the Eyewear and Premium Eyewear Markets;

ii.     The price of eyewear in the Eyewear and Premium Eyewear Markets has been fixed, stabilized, or maintained at artificially high levels; and

iii.    Individuals have been deprived of free and open competition.

89.     EssilorLuxottica's violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for eyewear than they would have in the absence of EssilorLuxottica's illegal conduct. Plaintiff and members of the Class have suffered damages in the form of overcharges paid on eyewear. This is an injury of the type that the antitrust laws were meant to punish and prevent.

**MARKET POWER**

90.     EssilorLuxottica holds significant market power in the Eyewear and Premium Eyewear Markets.

91.     EssilorLuxottica is the largest eyewear company in the world. With respect to sunglasses, for instance, EssilorLuxottica "owns nearly every popular brand of sunglasses sold worldwide as well as Sunglass Hut, where much of that eyewear is for sale."[12] In 2017, EssilorLuxottica accounted for 60% of all sunglass sales in the United States.

92.     EssilorLuxottica's market power is reflected in its ability to exclude competitors and to control prices. The indicia of EssilorLuxottica's market power include, but are not limited

---

[12] Dennis Green and Anaele Pelisson, "2 Companies control most of the sunglasses bought in the US, Business Insider (Aug. 25, 2017), *available at* "https://www.businessinsider.com/companies-dominate-sunglass-market-luxottica-safilo-2017-8.

to, EssilorLuxottica's ability to (a) coerce brands to accept exclusive licensing arrangements; (b) price its products without regard to its competitors' products; (c) impose premium prices; and (d) withhold a desired product—low-priced eyewear—from purchasers in the United States.

93.    Stating that the "the appearance of variety [in the Eyewear Market] is an optical illusion," SmartMoney.com columnist Brett Arends recounted to 60 Minutes journalist Lesley Stahl:

> Lesley Stahl: So is there a free market in eyewear?
> Brett Arends: No, I don't think there really is. I think one company has excessive dominance in the market.
>  . . . .
> Brett Arends: The reality is, it's like you know, it's like pro-wrestling competition. And it's actually fake competition.[13]

94.    Moreover, significant and lasting barriers make entry into the relevant market difficult. These barriers include but are not limited to: (a) product development costs; (b) capital requirements; (c) intellectual property rights; (d) technological expertise; (e) regulatory requirements; and (f) Defendants' unfair methods of competition.

95.    EssilorLuxottica owns an extensive list of trade names, patents, and technology processes. EssilorLuxottica owns over 12,000 patents and produces more than 3,500 new eyewear models every year.

96.    EssilorLuxottica's vertical integration itself serves as a barrier to entry and expansion, in that it uses its vision benefits plan—EyeMed—to move customers to the Retail Outlets and to EssilorLuxottica's Proprietary and Licensed Eyewear and to its Proprietary and Licensed Lenses.

---

[13] *Sticker shock: Why are glasses so expensive?*, CBS News (Oct. 7, 2012), *available at* https://web.archive.org/web/20130311035903/http://www.cbsnews.com/8301-18560_162-57527151/sticker-shock-why-are-glasses-so-expensive/?pageNum=3.

## PLAINTIFF'S CLAIMS ARE TIMELY

### A. Fraudulent Concealment Tolled the Statute of Limitations

97.     Application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class.

98.     EssilorLuxottica concealed the terms of the unlawful agreements described in this complaint, including the Licensing Agreements and the Sales Agreements, from Plaintiff and members of the Class. Plaintiff and members of the Class were not placed on actual, constructive, or inquiry notice of Defendants' antitrust violations by any facts that were known or reasonably should have been known to them.

99.     Upon information and belief, the Licensing Agreements, the Sales Agreements, and the agreements between EyeMed and its in-network providers contain provisions preventing the parties from disclosing the agreements' terms to the public.

100.     Additionally, as FCA publicized in Decision No. 21-D-20 that EssilorLuxottica avoided communicating in writing, recognizing it was engaging in anticompetitive conduct. For instance, Decision No. 21-D-20 quotes a Luxottica Sales Director who instructs the recipient to only communicate about the scheme by phone: "*Philippe can you contact the optician on this point ONLY BY TELEPHONE. PLEASE DELETE ALL YOUR E-MAILS ON THIS SUBJECT ASAP.*" (Machine translated; capitalization in the original emails).

101.     On information and belief, EssilorLuxottica took similar measures to avoid detection for its conduct in the United States.

### B. EssilorLuxottica's Actions Are a Continuing Violation

102.     In the alternative, this complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Plaintiff and members of the Class are entitled to recover damages they suffered during the limitations period.

103.    A cause of action accrued for Plaintiff and members of the Class each time Plaintiff or members of the Class purchased eyewear sold at a price artificially inflated by EssilorLuxottica's unlawful agreements or other anticompetitive practices.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons in the United States who purchased, for their personal or household consumption, Defendants' Proprietary Eyewear or Licensed Eyewear or eyewear from a Competing Manufacturer directly from one or more EssilorLuxottica operated physical or online outlets including, but not limited to, the Retail Outlets, anytime between 2007 and the present (the "Class Period").

105.    The following persons and entities are excluded from the above-described proposed Class:

    i.    Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

    ii.    All governmental entities;

    iii.    All Counsel of Record; and

    iv.    The Court, Court personnel, and any member of their immediate families.

106.    The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants. Plaintiff believes that due to the number of people in the United States who wear eyeglasses and sunglasses, there are likely millions of Class members.

107.    Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct

was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

i. Whether Defendants entered into exclusive Licensing Agreements with the Fashion Houses;

ii. Whether Defendants entered into the Sales Agreements with the Competing Manufacturers;

iii. Whether Defendants engaged in exclusionary conduct in the Eyewear Market and Premium Eyewear Market;

iv. Whether Defendants possessed market power in the Eyewear Market and Premium Eyewear Market;

v. The duration of the anticompetitive conduct alleged herein;

vi. Whether such anticompetitive conduct violated the federal antitrust laws;

vii. Whether the conduct of Defendants, as alleged in this complaint, caused injury to Plaintiff and members of the Class;

viii. Whether Defendants caused Plaintiff and members of the class Class to suffer damages in the form of overcharges on eyewear;

ix. The appropriate class-wide measure of damages; and

x. The nature of appropriate injunctive relief to restore competition in the Eyewear Market and Premium Eyewear Market.

108. Plaintiff's claims are typical of the claims of members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct.

109.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

110.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

111.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

112.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

113.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## CLAIMS FOR RELIEF

### COUNT 1

**Monopolization**
**Section 2 of the Sherman Act (15 U.S.C. § 2)**

**(Against All Defendants)**

114.   Plaintiff repeats the allegations set forth in Paragraphs 1-113, above, as if fully set forth herein.

115.   For purposes of antitrust review, the Eyewear Market is a relevant market, and the Premium Eyewear Market is a submarket within the Eyewear Market.

116.   EssilorLuxottica has substantial market power in the Eyewear Market and Premium Eyewear Market. EssilorLuxottica's position in these markets is protected by high barriers to entry and expansion. EssilorLuxottica imposes supracompetitive prices in the relevant markets.

117.   As detailed above, EssilorLuxottica willfully acquired and maintained that market power through anticompetitive, exclusionary, and predatory conduct, which EssilorLuxottica intended to have, and did actually have, the effects of foreclosing competition in the Eyewear Market and Premium Eyewear Market and inflating the price of eyewear in those markets.

118.   There is no legitimate business or pro-competitive justification for EssilorLuxottica's conduct, and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits could be achieved through alternative means that are less restrictive of competition.

119.   EssilorLuxottica's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

120.     As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Act, prices of EssilorLuxottica's Proprietary Eyewear and Licensed Eyewear have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

121.     Plaintiff seeks damages and injunctive relief on behalf of herself and members of the Class. The violations described above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## COUNT 2

### Attempted Monopolization
### Section 2 of the Sherman Act (15 U.S.C. § 2)

### (Against All Defendants)

122.     Plaintiff repeats the allegations set forth in Paragraphs 1-113, above, as if fully set forth herein.

123.     For purposes of antitrust review, the Eyewear Market is a relevant market, and the Premium Eyewear Market is a submarket within the Eyewear Market.

124.     EssilorLuxottica has substantial market power in the Eyewear Market and Premium Eyewear Market. EssilorLuxottica's position in these markets is protected by high barriers to entry and expansion. EssilorLuxottica imposes supracompetitive prices in the relevant markets.

125.     EssilorLuxottica specifically intended to monopolize the Eyewear Market and Premium Eyewear Market. There is a dangerous probability of EssilorLuxottica succeeding in monopolizing these markets.

126.    In furtherance of this attempt, EssilorLuxottica has engaged in anticompetitive conduct, as alleged in this complaint, to foreclose competition in the Eyewear Market and the Premium Eyewear Market.

127.    EssilorLuxottica's anticompetitive conduct has increased prices in the Eyewear Market and the Premium Eyewear Market and deprived purchasers of free and open choice.

128.    There is no legitimate business or pro-competitive justification for EssilorLuxottica's conduct, and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits could be achieved through alternative means that are less restrictive of competition.

129.    EssilorLuxottica's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

130.    As a direct and proximate result of EssilorLuxottica's continuing violation of Section 2 of the Sherman Act, prices of EssilorLuxottica's Proprietary Eyewear and Licensed Eyewear have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

131.    Plaintiff seeks damages and injunctive relief on behalf of herself and members of the Class. The violations described above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## COUNT 3

### Agreement in Restraint of Trade
### Section 1 of the Sherman Act (15 U.S.C. § 1)

### (Against All Defendants)

132.    Plaintiff repeats the allegations set forth in Paragraphs 1-113, above, as if fully set forth herein.

133.    In addition, or in the alternative, EssilorLuxottica has formed a cartel with the Fashion Houses and the Competing Manufacturers to artificially inflate the price of eyewear in the Eyewear Market and Premium Eyewear Market.

134.    For purposes of antitrust review, the Eyewear Market is a relevant market, and the Premium Eyewear Market is a submarket within the Eyewear Market.

135.    EssilorLuxottica has substantial market power in the Eyewear Market and Premium Eyewear Market. EssilorLuxottica's position in these markets is protected by high barriers to entry and expansion. EssilorLuxottica imposes supracompetitive prices in the relevant markets.

136.    EssilorLuxottica used it market power in the Eyewear Market and the Premium Eyewear Market to coerce the Fashion Houses to enter into multi-year, exclusive Licensing Agreements. The Licensing Agreements give EssilorLuxottica the authority to set prices for the licensed eyewear, or otherwise provide the means for EssilorLuxottica to control, maintain, and inflate the prices for all the licensed eyewear in the United States.

137.    The Licensing Agreements are horizontal agreements among competitors to restrain trade.

138.    In addition, EssilorLuxottica used it market power in the Eyewear Market and the Premium Eyewear Market to coerce Competing Manufacturers to enter into the Sales Agreements. Under the Sales Agreements, pricing decisions for sales through its Retail Outlets are delegated to EssilorLuxottica. The Sales Agreements include MFNs, which result in the alignment and inflation of prices to supra-competitive levels for the benefit of EssilorLuxottica and the Competing Manufacturers.

139. The Sales Agreements are horizontal agreements among competitors to restrain trade.

140. The existence of EssilorLuxottica's Licensing Agreements and Sales Agreements is and always has been well known to Defendants, the Fashion Houses, and the Competing Manufacturers.

141. There is no legitimate business or pro-competitive justification for EssilorLuxottica's conduct, and any purported legitimate business justifications are mere pretexts. Even if such a justification existed, any purported pro-competitive benefits could be achieved through alternative means that are less restrictive of competition.

142. Defendants' cartel is unlawful *per se*. In the alternative, Defendants' cartel is unlawful under either a quick look or rule of reason.

143. As a direct and proximate result of EssilorLuxottica's continuing violation of Section 1 of the Sherman Act, prices of EssilorLuxottica's Proprietary Eyewear and Licensed Eyewear have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

144. Plaintiff seeks damages and injunctive relief on behalf of herself and members of the Class. The violations described above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully request that the Court:

A. Determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and

her counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.      Adjudge and decree that the acts of Defendants are illegal and unlawful, and acts done in furtherance thereof by Defendants be adjudged to have been a violation of Section 1 and Section 2 of the Sherman Act (15 U.S.C. §§ 1, 2);

C.      Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

E.      Award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: November 10, 2023

Respectfully submitted,

*/s/ Brian M. Hogan*

36

Brian M. Hogan
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
bhogan@dicellolevitt.com

Gregory S. Asciolla*
Karin E. Garvey*
Jonathan S. Crevier*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
kgarvey@dicellolevitt.com
jcrevier@dicellolevitt.com

*pro hac vice* applications forthcoming

***Counsel for Plaintiff and the Proposed Class***